**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

IN RE

BERNARD V. TEW                                                         CASE NO. 20-51078
ANDREA B. TEW

DEBTORS

BERNARD V. TEW,                                                         PLAINTIFFS
*Individually and as Trustee on
Behalf of Bluegrass Investment LLC
Retirement Plan, et al.*

    vs.                                                              ADV. NO. 23-05042

ED&F MAN CAPITAL MARKETS, LTD.                                         DEFENDANT
*nka* MCML Limited

**MEMORANDUM OPINION GRANTING MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION**

        This matter is before the Court on a Motion to Dismiss [ECF No. 15] filed by Defendant

ED&F Man Capital Markets, Ltd. *nka* MCML Limited.  Among the many grounds offered for

dismissal, Defendant contends the Court lacks subject matter jurisdiction over this proceeding.

"Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to

declare the law, and when it ceases to exist, the only function remaining to the court is that of

announcing the fact and dismissing the cause."  *Ex parte McCardle*, 74 U.S. 506, 514 (1869).

The Court agrees subject matter jurisdiction is lacking and grants the Motion.

**PERTINENT FACTS AND PROCEDURAL HISTORY**

**I.      DEBTORS' CHAPTER 11 BANKRUPTCY CASE.**

        Bernard V. Tew ("Bernard") and Andrea B. Tew ("Andrea") (collectively, "Debtors"),

filed a voluntary chapter 11 petition on July 23, 2020.  Debtors' Schedule I/J reflected that

Bernard was a "Retired Investment Manager" receiving social security income and that Andrea

earned income as a controller.  Other filings in Debtors' chapter 11 case explain that Bernard,

whose academic degrees include a Ph.D. in Applied Economics, used to produce income as an

investment manager of and advisor for retirement plans.  In 2015, Bernard signed a consent

judgment resolving litigation that barred him from serving as a fiduciary of or providing services

to ERISA-covered employee benefit plans.  Bernard retained the ability to advise or serve as a

fiduciary of non-ERISA retirement accounts for himself and his relatives.

Debtors' Schedule A/B lists an asset—a "contingent and unliquidated claim[] of any

nature"—identified as follows: "ED&F Man for retirement plan investments (contingent on

settlement of claims) - $41.2M in US SKAT litigation and $41.2M in Denmark SKAT

litigation."  [Case No. 20-51078, ECF No. 40 at p.8.]  The reference to "US SKAT litigation"

concerned multiple then-pending lawsuits that Skatteforvaltningen, the Customs and Tax

Administration of the Kingdom of Denmark ("SKAT"), filed against Debtors and related parties.

The cases were centralized in a multidistrict litigation proceeding (the "MDL").  In essence,

SKAT alleged Debtors (and others) engaged in a fraudulent scheme to obtain tax refund

payments from SKAT that were not due but were improperly requested and paid.

 Debtors proposed several versions of a chapter 11 plan of reorganization accompanied

by disclosure statements.  These documents all explained Debtors' post-confirmation intent, as

Reorganized Debtors, to pay their living expenses with Andrea's employment income and

Bernard's social security income.  Bernard planned to generate additional revenue by engaging

in arbitrage trading activity[1] through the Tew family's non-ERISA retirement accounts to fund

---

[1] "Arbitrage trading is the simultaneous purchase and sale of the same or equivalent securities or commodities in
different markets or on different exchanges at different prices, in order to profit from the price differences between
markets."  *In re ContiCommodity Servs., Sec. Litig.*, 733 F. Supp. 1555, 1562 (N.D. Ill. 1990).

repayments to creditors. [Case No. 20-51078, ECF No. 243 (Debtors' Second Amended Plan of Reorganization ("Debtors' Plan")) at Art. II and ¶ 6.1.]

Debtors' Plan contains other pertinent provisions. It states all bankruptcy estate "Assets" would vest in the "Reorganized Debtors" (defined as "the Debtors as of and after the Confirmation Date"). [*Id*. at ¶ 6.2 and Exh. A (Plan Definitions).[2]] It provides the Reorganized Debtors' "Disposable Income," as well as quarterly $3,000 payments from Debtors, would be used to pay allowed unsecured claims (after payment of allowed administrative and priority claims), and defined "Disposable Income" to include "investment profits from their individual retirement accounts to the extent they exceed the exempt balance of $1,362,800 set forth in 11 U.S.C. § 522(n)." [*Id*. at ¶ 6.3 and Exh. A.]

Debtors' Plan also contained a term regarding anticipated litigation claims:

Prosecution of Claims and Causes of Action and Objections to Claims: The rights, duties and obligations of the Debtors to investigate, prosecute and collect all of the Debtors' causes of action and pursue Avoidance Actions, shall pass to and vest in the Reorganized Debtors as of the Effective Date. Specifically, **claims to be considered by the Reorganized Debtors include**, but are not limited to, claims for preferential and fraudulent conveyance claims under state and federal law and **claims identified in the Debtors' bankruptcy schedules against all Persons. If a motion or suit has not been filed to collect, prosecute or liquidate any action within one hundred and eighty (180) days after the Effective Date, it shall be deemed abandoned.** After the Effective Date, the Debtors may employ counsel to pursue any causes of action on a contingency fee basis without Bankruptcy Court approval. If the Debtors seek to employ counsel on terms which would require payments (other than expenses) from their Disposable Income, the Debtors shall seek approval of such employment from the Bankruptcy Court. **Any recovery from said litigation shall be deposited in the Reorganized Debtors' Account, subject to any professional fees and expenses associated with said litigation and payment of any income taxes due on such recoveries ("Net Litigation Recoveries"). Net Litigation Recoveries shall be used to pay Allowed Administrative, Secured, Priority and Unsecured**

---

[2] Debtors' Plan defines "Assets" to "mean, with respect to the Debtors, all of the right, title and interest in and to property of whatsoever type or nature, owned by the Debtors, as of the Effective Date, as well as the proceeds, products, rents and profits from all of the foregoing. Assets include, but are not limited to, property as defined in 11 U.S.C. § 541 (each identified item of property being herein sometimes referred to as an Asset)." [ECF No. 243 at Exh. A.]

**Claims, provided that no more than fifty (50%) percent of any Net Litigation Recoveries may be used to pay Allowed Secured Claims**.  Notwithstanding any provision relating to their Claims under the Plan, any Creditors having received a transfer of Estate property during the relevant look-back period of two (2) years before the Filing Date should assume they are subject to an Avoidance Action. The Reorganized Debtors retain the right to pursue any Claims they believe have merit.

[*Id*. at ¶ 6.4 (emphasis added).]  Thus, Debtors' Plan obliquely references the "contingent and unliquidated claim[] of any nature" related to "ED&F Man" listed on Debtors' Schedule A/B, but does not describe any specific cause of action to be filed against this party.  In fact, no version of a plan or disclosure statement filed in Debtors' chapter 11 case specifically identified Defendant by name or explained the nature of any claim Debtors intended to assert against Defendant.  Further, as set forth above, Debtors' Plan states "any action" the Reorganized Debtors did not pursue within 180 days of the "Effective Date" (defined as 15 days after entry of a confirmation order) "shall be deemed abandoned."  [*Id*.]

Finally, Debtors' Plan contained a "Retention of Jurisdiction" provision stating this Court would "retain jurisdiction of this Chapter 11 case" as to specific matters including:

To enable the Reorganized Debtors to consummate any and all proceedings which they may bring prior to the closing of these cases to set aside Liens or encumbrances, to recover any preferences, transfers, Assets, or damages to which the Reorganized Debtors may be entitled under applicable provisions of the Bankruptcy Code or other federal, state, or local law.

To recover all Assets and properties of the Debtors and Reorganized Debtors, wherever located.

. . .

To make such orders as are necessary or appropriate to carry out the provisions of this Plan, including ruling on motions regarding the liquidation of the Assets contemplated hereunder.

. . .

To hear any matters regarding interpretation, enforcement, implementation or consummation of the Plan and to correct any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order.

[*Id*. at ¶¶ 13.4, 13.5, 13.7, 13.9.]

4

Before confirming Debtors' Plan, the Court approved a settlement between Debtors and

SKAT, which had filed two general unsecured claims in Debtors' case for $33,996,000 and

$2,389,000.  Under the settlement, *inter alia*, the parties agreed SKAT would have allowed

unsecured claims treated under Debtors' Plan in the total amount of $36,385,000, and SKAT

would dismiss Debtors as individual defendants in the MDL.

The Court confirmed Debtors' Plan on October 19, 2021.  Defendant did not file a claim

or otherwise participate in Debtors' bankruptcy case.

## II.    THE COMPLAINT INITIATING THIS ADVERSARY PROCEEDING.

On June 14, 2023—well over a year after 180 days from the Effective Date of Debtors'

Plan—Debtors and two of their children ("Plaintiffs") filed the Complaint against Defendant,

commencing this proceeding.  More specifically, Plaintiffs are (1) Bernard, individually and as

Trustee on behalf of Bluegrass Investment Management LLC Retirement Plan, Bluegrass

Retirement Group Trust, MSJJ Retirement Group Trust, Autoparts Pensions Group Trust,

Casting Pensions Group Trust, Central Technologies Pensions Group Trust, Industrial Pensions

Group Trust, (2) Andrea, individually and as Trustee on behalf of Tew Enterprises LLC

Retirement Plan, (3) Stephanie Tew Campbell (Debtors' daughter), individually and as a member

on behalf of SV Holdings LLC Retirement Plan, and (4) Vincent Tew (Debtors' son),

individually and as Trustee on behalf of Tew LP Retirement Plan.[3]  In other words, while the

Complaint purports to seek relief to benefit four individuals and twelve Retirement Plans, only

Bernard and Andrea were debtors in bankruptcy.

By way of an introduction, the Complaint states:

> This case involves a diabolical scheme orchestrated by Defendant [ ] to take
> advantage of the [Retirement] Plans' tax-exempt status in foreign countries by

---

[3] The entities on whose behalf Plaintiffs filed claims (the "Retirement Plans") are alleged to be U.S. pension plans.
[Complaint at ¶ 19.]

> using the [Retirement] Plans to make fake securities trades, issue fake tax
> vouchers to a host of European governments, and steal hundreds of millions in tax
> refunds, all the while falsely assuring Plaintiffs that it was engaged in a legal
> trading strategy for their benefit, and then pinning the whole thing on Plaintiffs as
> soon as the tax authorities sought to recover their money.

[ECF No. 1 at ¶ 1.]  Generally, the Complaint alleges Plaintiffs—always acting through

Bernard—sought to engage in dividend arbitrage trading activity in Europe.  Because Bernard

was not licensed to do so, a third party connected Bernard with Defendant in early 2012.

Defendant agreed to execute arbitrage trades through prime brokerage accounts for the

Retirement Plans.  Defendant regularly emailed account statements and trading confirmations to

Bernard regarding trading activity accomplished through the Retirement Plans' accounts between

February 2012 and January 2015.  Defendant did not otherwise interact directly with Bernard

and instead communicated with him through the third party.

The Complaint alleges that, to further the scheme, the account documents Defendant

emailed to Bernard contained misrepresentations about the trades Defendant performed for the

Retirement Plans.  Plaintiffs assert Defendant also improperly submitted tax vouchers to SKAT

to seek recovery of Danish taxes purportedly withheld in connection with the trades, but the tax

vouchers contained false information as well.  SKAT later sued Plaintiffs to recover tax refund

payments improperly made to them based on Defendant's activity on the Retirement Plans'

behalf.  But Defendant effectively swept all funds from the Retirement Plans' prime brokerage

accounts in early 2015.  As a result, not only did Defendant defraud SKAT while acting on

Plaintiffs' behalf, leading SKAT to pursue Plaintiffs in the MDL, Defendant also took all the

funds in the Retirement Plans' accounts, leaving Plaintiffs unable to repay SKAT.

The Complaint asserts eleven counts against Defendant.  The first four counts seek relief

under the federal Racketeer Influenced and Corrupt Organizations Act ("Civil RICO"), codified

as Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §§ 1961 to 1968.  The other

counts seek relief under state law for breach of contract and various business torts.

The Complaint repeatedly indicates the actual damages Plaintiffs seek from ED&F

include but are not limited the $33,996,000 Plaintiffs allegedly "were forced to agree to pay … to

settle the actions brought by SKAT for losses caused by [Defendant's] violations."  [Complaint

at ¶ 119.][4]  The Complaint also alleges Defendant "provided a loan to [a Retirement Plan] of

approximately $20 million to facilitate early dividend arbitrage trading, which [Bernard] agreed

to pay back" and Bernard later "invested $29,262,594 in [that Retirement Plan] to offset

[Defendant's] loan, which funds became immediately available to [Defendant] to trade."  [*Id*. at

¶ 36.]  In this way, given that Defendant made trades on the Retirement Plans' behalf and swept

funds from their accounts, the Complaint alleges injuries incurred by the Retirement Plans, not

by the individual Plaintiffs.  At the hearing on the Motion, Plaintiffs argued Bernard personally

lost the funds he "invested" to "offset" Defendant's loan to a Retirement Plan, which funds

Defendant later swept from its account.  The Complaint does not allege, nor did Plaintiffs

identify at the hearing, any injury Andrea (or Stephanie or Vincent) personally suffered.

## DISCUSSION

## I.    THE COURT HAS JURISDICTION TO DECIDE THE PENDING MOTION.

Bankruptcy courts, like all federal courts, are courts of limited jurisdiction.  *Wasserman
v. Immormino (In re Granger Garage, Inc.)*, 921 F.2d 74, 77 (6th Cir. 1990) (citations omitted)

("The subject matter jurisdiction of the bankruptcy court is limited to that which congress

specifically grants.").  A federal court must assess its subject matter jurisdiction in each case.

*Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376-77 (1940) (a federal court

---

[4] As previously noted, the settlement in Debtors' bankruptcy case concerned the allowance of SKAT's general
unsecured claims for $33,996,000 and $2,389,000.  The Complaint does not reference the $2,389,000 claim.

has authority to determine whether it has subject matter jurisdiction over a dispute); *Pratt v. Ventas, Inc.*, 365 F.3d 514, 521 (6th Cir. 2004) ("'The court has the authority to pass upon its own jurisdiction . . . .'" (citation omitted)).

## II.    THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS PROCEEDING.

A sister court recently summarized the basics of bankruptcy jurisdiction:

> There are multiple federal statutes that define the scope of the bankruptcy court's subject-matter jurisdiction.  First, under 28 U.S.C. § 1334(b), "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  Second, 28 U.S.C. § 157(a) authorizes the district courts to refer "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 ... to the bankruptcy judges for the district."

*Elam v. Nationstar Mortg., LLC (In re Elam)*, Adv. Pro. No. 21-00098, 2022 Bankr. LEXIS 1340, at *8-9 (Bankr. W.D. Tenn. May 4, 2022), *aff'd*, *Elam v. Nationstar Mortg., LLC (In re Elam)*, No. 22-8012, 2023 Bankr. LEXIS 2135 (B.A.P. 6th Cir. Aug. 29, 2023).  As explained below, subject matter jurisdiction over this proceeding is lacking under 28 U.S.C. § 1334(b).

### A.    The legal standard applicable to motions under Civil Rule 12(b)(1).[5]

Defendant seeks relief under Civil Rule 12(b)(1), incorporated into this proceeding under Bankruptcy Rule 7012(b).

> When subject matter jurisdiction is challenged pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff has the burden of proving jurisdiction [by a preponderance of the evidence].  *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (citing *Rogers v. Stratton Industries, Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)).  Federal Rule of Civil Procedure 12(b)(1) motions to dismiss based upon subject matter jurisdiction generally come in two varieties: (1) a facial attack; or (2) a factual attack.  *See Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (identifying the two types of 12(b)(1) motions to dismiss).

---

[5] Unless otherwise indicated, references to the Federal Rules of Civil Procedure are referred to as "Civil Rule __" and the Federal Rules of Bankruptcy Procedure appear as "Bankruptcy Rule ____."

*Cottrell v. DeVillers*, Case No. 2:20-cv-5354, 2022 U.S. Dist. LEXIS 115605, at *3-4 (S.D. Ohio

June 20, 2022). The Motion is a facial attack. Defendant argues, even assuming the Complaint's

factual allegations are true, this Court lacks subject matter jurisdiction to adjudicate the asserted

claims.

### B.    This civil proceeding does not arise under the Bankruptcy Code.

Section 1334(b) confers original but not exclusive jurisdiction in the district court over

civil proceedings "arising under" the Bankruptcy Code. "The phrase 'arising under title 11'

describes those proceedings that involve a cause of action created or determined by a statutory

provision of title 11 . . . ." *Allard v. Coenen (In re Trans-Industries, Inc.)*, 419 B.R. 21, 26-27

(Bankr. E.D. Mich. 2009) (citations omitted); *Mich. Employment Sec. Comm'n (In re Wolverine

Radio Co.)*, 930 F.2d 1132, 1144 (6th Cir. 1991) (stating civil proceedings "arising under" title

11 "involve causes of action created or determined by a statutory provision of title 11.").

> An example of a civil proceeding arising under title 11 is an action to avoid a
> preferential transfer under § 547 of the Bankruptcy Code. *Moyer v. Bank of
> America (In re Rosenberger)*, 400 B.R. 569, 572-73 (Bankr. W.D. Mich. 2008)
> ("An avoidance action, such as the Trustee's preference action here, is the classic
> example of a proceeding based upon 'a substantive right created by federal
> bankruptcy law' as referred to by the Sixth Circuit.") (quoting *Browning v. Levy*,
> 283 F.3d 761, 773 (6th Cir. 2002)).

*Etterbeek v. APTCAM, LLC (In re Lewiston)*, 521 B.R. 811, 820 (Bankr. E.D. Mich. 2014).

None of the causes of action alleged in the Complaint arise under the Bankruptcy Code. They

arise under state law and Civil RICO, a different federal statutory scheme.

### C.    This civil proceeding does not "arise in" a case under the Bankruptcy Code.

Section 1334(b) also confers original but not exclusive jurisdiction in the district court

over a civil proceeding that "arises in" a case under the Bankruptcy Code.

> Civil proceedings "arising in" a case under title 11 "are those that, by their very
> nature, could arise only in bankruptcy cases." *In re Wolverine Radio*, 930 F.2d at
> 1144. Proceedings arising in a case under title 11 "are not based on any right

expressly created by Title 11, but nevertheless, would have no existence outside
of the bankruptcy." *McDaniel v. ABN AMRO Mortgage Group*, 364 B.R. 644,
647 (Bankr. S.D. Ohio 2007) (quotation marks and citation omitted). "Examples
of 'civil proceedings arising in' a case under Title 11 include administrative
matters; counterclaims by the estate against persons filing claims against the
estate; orders to turn over property of the estate and determinations of the validity,
extent or priority of liens." *Id.* (citation omitted).

*Id.* at 820-21.

The claims asserted in the Complaint are not of the sort that "would have no existence

outside of" a bankruptcy case, nor do they concern "administrative matters" that only arise in a

bankruptcy case. The Complaint seeks relief based on business tort claims that typically are

asserted in civil litigation between business parties outside of the bankruptcy context.

**D.    This civil proceeding is insufficiently "related to" a case under the
Bankruptcy Code.**

A bankruptcy court's jurisdiction over a civil proceeding as "related to" a bankruptcy

case constitutes the "outer limits of the district court's referral to its bankruptcy judges[.]" *Evans*

*& Assoc. v. Macnichol (In re Macnichol)*, 240 B.R. 731, 732 (Bankr. S.D. Ohio 1999). This

Court lacks "related to" jurisdiction over this proceeding.

**1.    The status of the Sixth Circuit's standard to assess jurisdiction over
an adversary proceeding "related to" a chapter 11 case after plan
confirmation is unclear.**

Plaintiffs contend the Court has subject matter jurisdiction over this adversary proceeding

"because [the] outcome of the proceeding could conceivably impact Bernard and Andrea Tew's

bankruptcy estate." [ECF No. 31 at 5-6.] Plaintiffs cite well-established Sixth Circuit law on

"related to" jurisdiction to make this argument, including *Wolverine Radio*, 930 F.2d 1132. In

*Wolverine Radio*, the Sixth Circuit adopted the Third Circuit's *Pacor* test used to assess whether

"related to" jurisdiction exists over an adversary proceeding:

The usual articulation of the test for determining whether a civil proceeding is
related to bankruptcy is whether *the outcome of that proceeding could*

10

> conceivably have any effect on the estate being administered in bankruptcy. An
> action is related to bankruptcy if the outcome could alter the debtor's rights,
> liabilities, options, or freedom of action (either positively or negatively) and
> which in any way impacts upon the handling and administration of the bankrupt
> estate.

*Id*. at 1142 (quoting *Pacor, Inc. v. Higgins (In re Pacor)*, 743 F.2d 984, 994 (3d Cir. 1984)

(internal quotation marks omitted)). The Supreme Court also has cited *Pacor* favorably. *See*

*Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) ("We agree with the views expressed [in

*Pacor*] that 'Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so

that they might deal efficiently and expeditiously with all matters connected with the bankruptcy

estate,' and that the 'related to' language of § 1334(b) must be read to give district courts (and

bankruptcy courts under § 157(a)) jurisdiction over more than simply proceedings involving the

property of the debtor or the estate.") (citations omitted)).

But Sixth Circuit authority is unclear as to the scope of a bankruptcy court's "related to"

jurisdiction over an adversary proceeding filed after chapter 11 plan confirmation. When

espousing the *Pacor* test, the Sixth Circuit did so "with the caveat that 'situations may arise

where an extremely tenuous connection to the estate would not satisfy the jurisdictional

requirement.'" *Wolverine Radio*, 930 F.2d at 1142 (citation omitted). This caveat dovetails with

the Supreme Court's admonition in *Celotex* that "a bankruptcy court's 'related to' jurisdiction

cannot be limitless" and "bankruptcy courts have no jurisdiction over proceedings that have no

effect on the estate of the debtor." *Celotex Corp.*, 514 U.S. at 308, n.6.

Two decades after *Wolverine Radio*, the Sixth Circuit revisited "related to" bankruptcy

jurisdiction and stated the scope of bankruptcy jurisdiction *may* change as a chapter 11 case

progresses. The court first explained "[t]he grant of jurisdiction over proceedings 'related to' the

bankruptcy case is quite broad[,]" and "the 'related to' inquiry asks . . . whether there is a nexus

between the other proceeding and the *bankruptcy case*." *Papas v. Buchwald Capital Advisors,*

11

*LLC (In re Greektown Holdings, LLC)*, 728 F.3d 567, 577-78 (6th Cir. 2013). It then recognized the *Pacor* test does not apply cleanly to a proceeding after plan confirmation in a related chapter 11 case because, "[a]t the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred." *Id*. at 577 (quoting, *inter alia*, *Resorts Int'l Fin., Inc. v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 165 (3d Cir. 2004)). For this reason, the Sixth Circuit wrote, "[i]t is possible that a bankruptcy court's 'related to' jurisdiction diminishes somewhat post-confirmation." *Id*.

The Sixth Circuit and courts within the circuit have cited *Greektown Holdings* for the proposition that jurisdiction over a related proceeding diminishes after chapter 11 plan confirmation. *See, e.g.*, *Giese v. Lexington Coal Co. (In re HNRC Dissolution Co.)*, 761 Fed. App'x 553, 560 (6th Cir. 2019); *In re St. James Nursing & Physical Rehab. Ctr., Inc.*, 645 B.R. 220, 249-50 (Bankr. E.D. Mich. 2022); *In re CS DIP, LLC*, Case No. 12-01573 (jointly administered), 2015 Bankr. LEXIS 3435, at *27 (Bankr. M.D. Tenn. Oct. 9, 2015). Courts have referred to post-confirmation jurisdiction as "sharply" reduced, "somewhat" reduced, "fairly narrow," and "pared down." *See In re Ventilex USA, Inc.*, 509 B.R. 140, 143 (Bankr. S.D. Ohio 2014); *CS DIP, LLC*, 2015 Bankr. LEXIS 3435, at *33; *In re Wisper, LLC*, Case No. 13-10770, 2015 Bankr. LEXIS 2505, at *14-16 (Bankr. W.D. Tenn. Feb. 13, 2015); *In re Eastland Partners, Ltd., Partnership*, 199 B.R. 917, 919-20 (Bankr. E.D. Mich. 1996).

Many courts grappling with the scope of "related to" jurisdiction after chapter 11 confirmation, including the Sixth Circuit's Bankruptcy Appellate Panel, have found "related to" jurisdiction over an adversary proceeding exists post-confirmation only when there is "a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction

12

over the matter." *Resorts Int'l,* 372 F.3d at 166-67; *see also Thickstun Bros. Equip. Co. v. Encompass Servs. Corp. (In re Thickstun Bros. Equip. Co.),* 344 B.R. 515, 521 (B.A.P. 6th Cir. 2006) (citing *Resorts Int'l* for its "close nexus" test); *Valley Historic Ltd. P'ship v. Bank of N.Y.,* 486 F.3d 831, 837 (4th Cir. 2007) ("We find the Third Circuit's 'close nexus' requirement to be a logical corollary of 'related to' jurisdiction.  Analytically, it insures that the proceeding serves a bankruptcy administration purpose on the date the bankruptcy court exercises that jurisdiction. Without such a purpose, 'related to' jurisdiction would extend beyond the limited jurisdiction conferred upon bankruptcy courts in the postconfirmation context."); *c.f. Montana v. Goldin (In re Pegasus Gold Corp.),* 394 F.3d 1189, 1195 (9th Cir. 2005) (after a chapter 11 plan's confirmation "the *Pacor* formulation may be somewhat overbroad"); *Bank of Louisiana v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.),* 266 F.3d 388, 390 (5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or the execution of the plan.").  In the seminal case adopting the "close nexus" standard, the Third Circuit explained: "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Resorts Int'l,* 372 F.3d at 167.

But the Sixth Circuit "has not yet endorsed this 'close nexus' test for narrowed post-confirmation jurisdiction[.]" *HNRC Dissolution Co.,* 761 Fed. App'x at 561 n.4; *see also Bavelis v. Doukas,* 835 Fed. App'x 798, 805 (6th Cir. 2020) (citing *HNRC*).  Further, a district court within the Circuit questioned whether plan confirmation affects bankruptcy jurisdiction at all. *McKinstry v. Sergent,* 442 B.R. 567, 575 (E.D. Ky. 2011) (noting 28 U.S.C. § 1334(b) "makes

no distinction between pre- and post-confirmation jurisdiction").  In sum, there is no controlling or clear authority to guide the determination of post-confirmation "related to" jurisdiction.

### 2. Contribution of litigation proceeds to a plan is not enough to establish "related to" jurisdiction.

A decade ago, Judge Lundin wrote a detailed opinion assessing the state of the law on "related to" jurisdiction.  *Equip. Finders, Inc. v. Fireman's Fund Ins. Co. (In re Equip. Finders, Inc.)*, 473 B.R. 720 (Bankr. M.D. Tenn. 2012).  It cites several cases to support the proposition "that 'related to' jurisdiction requires more than a vague notion that litigation might increase a dividend to creditors under the plan."  *Id.* at 732-33.  Contrasting liquidating and reorganization plans, Judge Lundin reasoned filing claims to marshal all the debtor's assets for the benefit of creditors under a liquidating plan provided a sufficient basis for "related to" jurisdiction.  *Id.* at 733 (citing *Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr., Inc.)*, 410 F.3d 100 (1st Cir. 2005)).  More generally, upon surveying pertinent Sixth Circuit authority, Judge Lundin found: "If a common theme can be extracted . . ., it is that 'related to' jurisdiction in the post confirmation period expands or contracts depending on the relationship between the post confirmation debtor and the defendant, the language of the confirmed plan and the impact the matter will have on performance of the confirmed plan."  *Id*. at 731.

The Court agrees that, by itself, the possibility that success in an adversary proceeding may result in an increased distribution to creditors does not suffice to find "related to" jurisdiction exists over that proceeding post-confirmation.  *See*, *e.g.*, *Morris v. Zelch (In re Reg'l Diagnostics, LLC)*, 372 B.R. 3, 23 (Bankr. N.D. Ohio 2007) ("While the potential to increase recovery to the creditors or former creditors of the estate is not enough alone to confer jurisdiction, potential benefit to creditors or former creditors weighs in favor of jurisdiction."). As the Ninth Circuit expressed, the contrary view allows a debtor to manufacture jurisdiction

over any post-confirmation adversary proceeding—like a suit to collect a debtor's pre- or post-petition account receivable after it has "returned to the marketplace"—by committing in their plan to contribute some amount from any litigation recovery to pay their creditors. *Pegasus Gold Corp.*, 394 F.3d at 1194 n.1 (stating the Ninth Circuit panel was "not persuaded by the [ ] argument that jurisdiction lies because the action could conceivably increase the recovery to the creditors. . . . [S]uch a rationale could endlessly stretch a bankruptcy court's jurisdiction."); *see also Fairchild Liquidating Trust v. New York (In re Fairchild Corp.)*, 452 B.R. 525, 531 (Bankr. D. Del. 2011) ("[T]he possibility of increasing the assets of a trust and distribution to creditors does not necessarily create a close nexus that would confer jurisdiction on the bankruptcy court. The scope of the bankruptcy court's post-confirmation jurisdiction would be unlimited if the potential gain or loss of assets alone was sufficient to confer bankruptcy court jurisdiction." (footnotes omitted)).

> **3.      Several factors provide guidance for determining whether "related to" jurisdiction exists over an adversary proceeding.**

The *Equipment Finders* opinion also cites cases in which courts assessed whether "related to" jurisdiction existed using assorted factors. *Equip. Finders, Inc.*, 473 B.R. at 733-34 (citing, *inter alia*, *In re Blast Energy Servs., Inc.*, 396 B.R. 676 (Bankr. S.D. Tex. 2008); *BWI Liquidating Corp. v. Rialto (In re BWI Liquidating Corp.)*, 437 B.R. 160 (Bankr. D. Del. 2010)).

Given the uncertain state of Sixth Circuit law defining the scope of post-confirmation "related to" jurisdiction, the Court will identify the factors considered in assessing "related to" jurisdiction over this civil proceeding. Weighing these factors led to the conclusion this proceeding lacks a nexus with Debtors' chapter 11 bankruptcy case sufficient to find jurisdiction. The factors are: (1) whether the parties in the proceeding participated in the debtor's bankruptcy case, (2) whether the chapter 11 debtor reorganized its affairs or liquidated through bankruptcy,

(3) whether the claims pertain to activity in or leading to the bankruptcy case, (4) whether a close

nexus exists between the debtor's plan or bankruptcy case and the proceeding; and (5) whether

and how the confirmed plan addresses or references the claims asserted in the proceeding.

### a.    Defendant did not participate in Debtors' bankruptcy case.

Defendant was not involved in Debtors' bankruptcy case in any way.  It was not a

creditor.  It did not file a claim.  It did not provide services to or have a contractual or other

commercial relationship with Debtors during the bankruptcy.  Debtors terminated their

relationship with Defendant in early 2015, more than five years before Debtors filed their

petition.  Defendant thus has no connection to Debtors' bankruptcy case, which weighs against

finding "related to" jurisdiction over this proceeding.

### b.    Debtors reorganized in bankruptcy.

Debtors confirmed a plan of reorganization in October 2021.  Upon emerging from

bankruptcy supervision, Bernard intended to recommence arbitrage trading activities.  In other

words, Debtors were authorized to "re-enter the marketplace."  This weighs against finding

"related to" jurisdiction over this proceeding.

Construing "related to" subject matter jurisdiction over post-confirmation adversary

proceedings involving a reorganized debtor too broadly could lead to the indefinite continuation

of bankruptcy court jurisdiction.  The First Circuit explained this problem and distinguished

between a reorganized debtor that will "re-enter the marketplace" and a debtor that is liquidating

its assets in bankruptcy and stops operating:

> The rationale behind this line of decisions [finding the scope of "related to"
> jurisdiction narrows post-confirmation] starts with the premise that a reorganized
> debtor is emancipated by the confirmation of a reorganization plan.  It emerges
> from bankruptcy and enters the marketplace in its reincarnated form.  From that
> point forward, it is just like any other corporation; "it must protect its interests in
> the way provided by the applicable non-bankruptcy law," without any special
> swaddling.  Given the broad sweep of related to jurisdiction, applying the general

rule without qualification after the confirmation of a reorganization plan easily could result in the bankruptcy court retaining jurisdiction of all cases affecting the reorganized debtor for many years thereafter. This prospect not only would work an unwarranted expansion of federal court jurisdiction but also would unfairly advantage reorganized debtors by allowing such firms to funnel virtually all litigation affecting them into a single federal forum.

. . .

There is another, perhaps more important, reason for distinguishing between liquidating plans and true reorganization plans. Courts that have limited the scope of post-confirmation jurisdiction have based their holdings on the conclusion that, once confirmation has occurred, fewer proceedings are actually related to the underlying bankruptcy case. That makes good sense: as the corporation moves on, the connection attenuates.

This justification is absent in the case of a liquidating plan. Typically, a reorganized debtor is attempting to make a go of its business. Thus, its actions (including any involvement in litigation) redound primarily to that end and only affect the underlying bankruptcy proceeding in a tangential or derivative way. By contrast, a liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court. Any litigation involving such a debtor thus relates much more directly to a proceeding under title 11.

*Boston Reg'l Med. Ctr.,* 410 F.3d at 106-107 (citations omitted); s*ee also E. Ky. Power Coop., Inc. v. Greenwich Ins. Co.*, Civil Action No. 05-137-JBC, 2006 U.S. Dist. LEXIS 2518, at *4-5 (E.D. Ky. Jan. 24, 2006) ("Cases involving continuing trusts, such as liquidation or litigation trusts, generally maintain a connection to the bankruptcy even after the plan has been confirmed."); *Kravitz v. Summersett (In re Great Lakes Comnet, Inc.)*, 586 B.R. 718, 721 (Bankr. W.D. Mich. 2018) (finding "related to" jurisdiction over proceeding filed by liquidating trustee as the claim "could form the basis for increased payments to creditors under the Debtor's confirmed plan of liquidation"); *In re Air Cargo, Inc.*, 401 B.R. 178 (Bankr. D. Md. 2008) ("[R]egardless of whether the same jurisdictional statutes apply to both liquidating and reorganizing plans, a post-confirmation civil proceeding is far more likely to be 'related to' the underlying bankruptcy case when the debtor is being liquidated."); *Guttman v. Martin (In re Railworks Corp.)*, 325 B.R. 709, 719 (Bankr. D. Md. 2005) (holding the presence of a litigation

trust established a nexus between the adversary proceeding and the debtor's estate as the litigation trustee "represent[ed] the estate by assuming the obligations to prosecute the instant claims for the benefit of unsecured creditors.").

> c.     **The asserted causes of action, arising under state law and non-bankruptcy federal law by Debtors and non-debtors, do not relate to activity in the bankruptcy case.**

Pertinent to whether "related to" jurisdiction exists is whether a complaint's allegations concern activity in or leading to the bankruptcy case.  If the claims in a proceeding are rooted in bankruptcy, a stronger argument exists to find "related to" jurisdiction.  For example, one court found "related to" jurisdiction over state law legal malpractice-related claims asserted against a law firm as they

> arose out of Defendants' acts in their representation of the debtor-in-possession . . . in the underlying Chapter 11 bankruptcy case before this court, for which the court had supervisory oversight over Defendants' employment and compensation during the pendency of the bankruptcy case, and thus, the complained of acts of Defendants alleged in Plaintiff's state court complaint arose from the handling and administration of the bankrupt estate.

*Evans v. Tippie (In re C & M Russell, LLC)*, Adv. No. 2:16-ap-01577-RK, 2017 Bankr. LEXIS 265, at *5 (Bankr. C.D. Cal. Jan. 31, 2017).  A district court concluded state law and Civil RICO claims against defendants, who allegedly participated in a scheme to defraud a debtor's shareholders *including through filing a "sham" chapter 11 bankruptcy case*, were sufficiently related to the bankruptcy case to find subject matter jurisdiction existed.   *Tang v. Citic Capital Holdings Ltd.*, Civil Action No. 21-17008-JXN-AME, 2022 U.S. Dist. LEXIS 184505, at *18 (D.N.J. Oct. 7, 2022).  And the Sixth Circuit concluded "related to" jurisdiction existed over claims a non-debtor plaintiff asserted against non-debtor defendants because those claims alleged an estate asset was wrongfully transferred to the defendants without notice to the plaintiff as part of a chapter 11 sale and confirmation process.  Thus, the plaintiff's claims concerned "the

interpretation, validity, and enforcement of the bankruptcy court's orders" in the chapter 11 case.
*HNRC Dissolution Co.*, 761 Fed. App'x at 560-61.

Conversely, when causes of action are not rooted in bankruptcy and could be pursued outside of bankruptcy, a connection between the proceeding and the bankruptcy case or plan is more tenuous. Here, the Civil RICO and state law claims against Defendant do not pertain to activity in Debtors' bankruptcy case. Plaintiffs allege Defendant's conduct in 2012-2015 subjected Debtors to litigation initiated in 2018, which, due to mounting legal fees, ultimately forced Debtors to seek bankruptcy protection in 2020. [Complaint at ¶¶ 50-64.] Further, the claims at issue are brought not only by Debtors—and by them in both individual and representative capacities—but also by their non-debtor children in their individual and representative capacities. The claims in the Complaint, primarily brought on behalf of twelve Retirement Plans for Defendant's conduct years before Debtors filed a bankruptcy petition, are not rooted in bankruptcy.

> **d.     This proceeding does not have a close nexus with Debtors' Plan or bankruptcy case sufficient to find "related to" jurisdiction.**

The Sixth Circuit has not adopted the "close nexus" standard, but assessing whether a proceeding satisfies that standard is useful as one of many factors. One aspect of the analysis is simple here; none of the claims in the Complaint would require a reviewing court to interpret Debtors' Plan or to enforce any of its provisions. The remaining aspects are less straightforward.

Plaintiffs have not shown their lawsuit against Defendant affects the implementation, administration, or execution of Debtors' Plan. Debtors' Plan certainly *permits* Debtors to institute litigation to pursue "all of the Debtors' causes of action" and states that, if the litigation is successful, "[a]ny recovery from said litigation shall be deposited in the Reorganized Debtor's

Account"[6] and "Net Litigation Recoveries shall be used to pay" claims identified in Debtors'

Plan. [ECF No. 243 at ¶ 6.4.]  However, Debtors' failure to institute litigation, including

litigation against Defendant, would not constitute a failure to comply with the Plan.  Rather, as

reviewed above, the Plan states: "If a motion or suit has not been filed to collect, prosecute or

liquidate any action within one hundred and eighty (180) days after the Effective Date, it shall be

deemed abandoned."  [*Id.*]  Thus, the Plan permits Debtors to *not* pursue the subject claims.

Whether Debtors pursue claims against Defendant does not affect the implementation,

administration, or execution of Debtors' Plan.

Moreover, it is unclear that Debtors individually have any recoverable claims against

Defendant that would result in "Net Litigation Recoveries" to contribute to Debtors' Plan if

litigation against Defendant were to be successful.  As explained above, Debtors and their

children filed claims against Defendant in their personal capacities and on behalf of twelve

Retirement Plans.  The Complaint's allegations suggest only the Retirement Plans incurred any

injury owing to Defendant's conduct.  The Retirement Plans' funds, not Debtors' personal funds,

allegedly were used to carry out fraudulent trading activity, resulting in liability to SKAT.  The

Retirement Plans' funds, not Debtors' personal funds, allegedly were swept from the Retirement

Plans' prime brokerage accounts; to the extent the Complaint alleges Bernard "invested" funds

into a Retirement Plan's account, the invested funds became the Retirement Plan's funds.

Accordingly, based on the Complaint's allegations, it is tenuous at best that Debtors would be

entitled to recover any funds in their personal capacities from Defendant.

The claims in the Complaint do not affect plan consummation.  Debtors' Plan states:

"Substantial consummation shall occur when the Reorganized Debtors make initial distributions

---

[6] Debtors' Plan does not define this term.

to Creditors under the Plan." [*Id*. at ¶ 12.6.]  Debtors' Plan requires Debtors to contribute

Bernard's social security income and Andrea's income as a controller to pay their ordinary living

expenses, requires Debtors to deposit $3,000 from their disposable income every quarter into an

escrow account for distribution to creditors, requires Debtors to contribute profits generated by

Bernard's arbitrage trading "to fund the payments to Creditors proposed by the Plan[,]" and

states "Debtors will also contribute any net recovery from litigation to fund payments under the

Plan." [*Id*. at ¶¶ 6.1, 6.2.]  Plaintiffs have not established that instituting litigation against

Defendant affects the consummation of Debtors' Plan, particularly as pursuit of this proceeding

is not required.

In addition, some courts applying the close nexus standard hold ancillary litigation

arising out of post-confirmation conduct does not provide a sufficient nexus to warrant "related

to" jurisdiction over a resulting adversary proceeding.  *See*, *e.g.*, *Resorts Int'l*, 372 F.3d at 163,

169-71 (3d Cir. 2004) (rejecting argument that malpractice claims by liquidating trustee against

accounting firm providing audit reports post-confirmation were related to the underlying

bankruptcy case).  Others hold "claims based on pre-petition conduct that were asserted post-

confirmation, but could have been brought prior to confirmation[,] lack a nexus sufficient to

confer jurisdiction upon the bankruptcy court." *Fairchild Corp.*, 452 B.R. at 531-32 (concluding

"a breach of contract claim based on pre-petition conduct filed post-confirmation belongs to the

reorganized debtor, without regard to when and how the claim arose." (footnotes omitted)).

Here, the claims asserted against Defendant arose prepetition, and thus do not arise from an

ancillary post-confirmation dispute.  But the claims are based on activity—allegedly fraudulent

trades and refund requests and the sweeping of funds from accounts—that occurred five to eight

years before Debtors filed their bankruptcy case.  Further, Debtors' Complaint was filed post-confirmation, after which time "related to" jurisdiction "diminishes" per *Greektown Holdings*.

In sum, this factor does not support a finding of "related to" jurisdiction.

       **e.**    **Debtors' Plan does not expressly preserve jurisdiction over the claims against Defendant.**

Finally, in tandem with the close nexus requirement, some courts find whether a plan "preserves" subject matter jurisdiction over a claim to be an important factor in finding post-confirmation jurisdiction.  *See, e.g., Ventilex*, 509 B.R. at 143 ("In determining whether a bankruptcy court has post-confirmation jurisdiction over a matter, the court must first determine that 'the matter [has] a close nexus to the bankruptcy plan or proceeding ... [and] second, the plan must provide for the retention of jurisdiction over the dispute.'" (citations omitted)); *Shandler v. DLJ Merch. Banking, Inc. (In re Insilco Techs., Inc.)*, 330 B.R. 512, 525 (Bankr. D. Del. 2005) (finding a close nexus lacking as "[t]he general language of the Plan and Disclosure Statement concerning post-confirmation litigation does not provide any notice to creditors (or to the Court, for that matter) as to the importance of this or any particular litigation" and "[i]f the litigation is truly so critical to the Plan's implementation, it would have been more specifically described in the Disclosure Statement and Plan so that creditors could have considered its effect when deciding whether to vote in favor of the Plan." (footnote omitted)).

There is no close nexus between this proceeding and Debtor's bankruptcy case or Plan, as explained above.  But even if there were, the retention of jurisdiction provision in Debtors' Plan does not specifically identify, let alone describe, any claim Debtors may have or bring against any party.  [ECF No. 243 at Art. XIII.]  The paragraphs in the Plan that arguably purport to retain jurisdiction over adversary proceedings are extremely general.  Nowhere in the Plan is Defendant identified.  While the term in the Plan about Debtors' right to pursue claims states Debtors'

schedules identify claims they might pursue, and while Debtors' Schedule A/B includes a vague

description of a "contingent and unliquidated claim[] of any nature" against "ED&F Man," these

references are wholly insufficient to preserve Debtors' non-bankruptcy claims against

Defendant. *See, e.g., BWI Liquidating Corp.*, 437 B.R. at 165-66 ("a Plan must specifically

describe a cause of action in order to retain 'related to' jurisdiction.").

**CONCLUSION**

The Court lacks "arising in" and "arising under" subject matter jurisdiction over this

adversary proceeding.  Applying pertinent factors, the Court concludes "related to" jurisdiction

also is lacking.  Bearing in mind the Sixth Circuit's admonition that situations may arise in

which an extremely tenuous connection to the estate will not be sufficient to establish "related

to" jurisdiction, *Wolverine Radio*, 930 F.2d at 1142, this adversary proceeding has an

extraordinarily tenuous connection to Debtors' reorganization.  The Complaint asserts non-

bankruptcy claims accruing several years prepetition, which Debtors' Plan does not require them

to pursue, against a defendant that had no role in Debtors' chapter 11 case, brought by Debtors

and their non-debtor children to recover damages for injuries allegedly incurred by twelve non-

debtor Retirement Plans.

Accordingly, the Motion is GRANTED and the Court will dismiss this adversary

proceeding for a lack of subject matter jurisdiction under 28 U.S.C. § 1334(b).  A separate order

will be entered concurrent with this opinion.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Tracey N. Wise*
**Bankruptcy Judge**
**Dated: Thursday, November 16, 2023**
**(tnw)**